## TIGER v. FEWELL et al.

Circuit Court of Appeals, Eighth Circuit.
November 10, 1927.

No. 7685.

Indians ⊂⇒ 13(6)—Placing member of tribe on freedman roll fixed his status as allottee (Act April 21, 1904, § 1 [33 Stat. 204]).

Action of the Dawes Commission in placing a member of either of the Five Civilized Tribes on the freedman roll, instead of the Indian roll, conclusively fixed his status as an allotee, for the purposes of subsequent legislation relating to removal of restrictions on alienation, such as Act April 21, 1904, § 1 (33 Stat. 204).

Appeal from the District Court of the United States for the Northern District of Oklahoma; Franklin E. Kennamer, Judge.

Suit in equity by Joe H. Tiger against William M. Fewell and others. Decree for defendants, and complainant appeals. Affirmed.

William Neff, of Tulsa, Okl. (Lewis E. Neff, of Tulsa, Okl., on the brief), for appellant.

Mather M. Eakes, of Tulsa, Okl. (Allen, Underwood & Smith and Randolph, Haver, Shirk & Bridges, all of Tulsa, Okl., McQueen & Kidd, of Oklahoma City, Okl., G. C. Spillers, C. R. Thurlwell, and T. L. Brown, all of Tulsa, Okl., O. E. Swan, of Muskogee, Okl., Christy Russell, of Tulsa, Okl., James D. Gibson, of Muskogee, Okl., and Travis I. Milsten, Ben Kochman, and A. E. Montgomery, all of Tulsa, Okl., on the brief), for appellees.

Before STONE, Circuit Judge, and REEVES and OTIS, District Judges.

STONE, Circuit Judge. This in an action for cancellation of certain deeds and to remove them as clouds from the title. The action was brought by Joe H. Tiger, who was entered on the Creek rolls as a freedman, but who claims to have Creek Indian blood. April 22, 1904, plaintiff conveyed his surplus allotment to William M. Fewell and Sidney M. Smith and they, by mesne conveyances, have granted some or all of the land to one or more of the other defendants, numbering more than sixty. This land was allotted under the Creek Agreements, which provided that the land should be restricted for a term of five years. The Act of April 21, 1904, provided that "all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed." 33 Stat. 204. The claim of the petition is that because the plaintiff had Indian blood, although on the freedman rolls, the above act did not remove the restrictions as to him and, consequently, the above conveyance is void.

Practically this same petition was filed in the state court, a demurrer thereto sustained, that order affirmed by the state Supreme Court, certiorari denied (269 U. S. 572, 46 S. Ct. 100, 70 L. Ed. 418), and writ of error dismissed (271 U. S. 649, 46 S. Ct. 637, 70 L. Ed. 418) by the United States Supreme Court.

Two contentions are here presented. First, whether the adjudication in the state court is res adjudicata; and, second, if such decision be not res adjudicata, whether the act of 1904 removed the restrictions as to plaintiff. Because of the view we take concerning the second proposition, we deem it unnecessary to discuss the other one.

As the petition alleges that the plaintiff was on the freedman rolls and that he was of Indian blood, the demurrer fairly presents the question whether the act of 1904 removed the restrictions from those on the freedman rolls who had Indian blood. Reading the statute standing alone, its meaning might well be that all allottees, of the Five Civilized Tribes, of Indian blood would remain under restrictions, but this statute was intended to have a very practical application to an existing state of affairs with which Congress was entirely familiar. Viewing the statute in the light of such application, its meaning is not clear for there are two equally plausible constructions which it might have.

In each of the Five Civilized Tribes, slaves had been owned and, under the treaties immediately following the Civil War, those slaves had been freed and made members of the tribes. Because the right to share in tribal lands and property depended upon membership in the tribe, when the time approached for allotments of such land and property to be made, tribal rolls were made up to ascertain who were entitled thereto. In each of these tribes there were at least two rolls, one of these tracing right of citizenship through the former slaves, called the freedman roll, and one tracing such right through the Indian blood, called the Indian roll. The determination whether an applicant was entitled to any enrollment in the tribe, and, if so, upon which one of the rolls, was vested in the Dawes Commission which, in performing such duties, was acting in a quasi judicial capacity. In the Creek Nation, there was no difference in the allotment or treatment of freedmen and of Indian citizens but there was a difference in other of

the Five Civilized Tribes and the act of 1904 is general as to such tribes. Therefore, it may well be taken that the rolls were intended to certify that all Indians were upon the Indian rolls and only those who could not qualify upon the Indian rolls were upon the freedman rolls. The Creek Allotment Agreements were by the Congress preceding that of 1904, and most of the other agreements with the four other tribes were about that time and Congress had very recently worked out and put in force this system of rolls as a basis for allotments. Therefore, it may well be said that Congress had this situation in mind when it passed this first act removing restrictions from allotted lands.

Appellant presents a very plausible argument that Congress meant to retain the restrictions as to all allottees having any degree of Indian blood because of the well-known improvidence of the Indian and that this intention can be worked out only by applying the act to all allottees who had any degree of Indian blood. However, it would seem that in establishing separate rolls for the freedmen, Congress must have had some purpose and it is difficult to see what that purpose could have been unless it was that those on the freedman rolls should be regarded as citizens of the tribes, but as non-Indians. Otherwise, all members of the tribe might well have been entered upon one tribal roll.

Therefore, in the above act the use of the term "Indian blood" might have been intended to apply to the status as established by the rolls. Such an intention would avoid the complexities and distressing situations as to title, which are typified in this particular case, where the conveyance of no freedman could be safely taken without a prior determination as to whether he had a drop of Indian blood—a matter of doubtful and difficult ascertainment in most of the tribes and particularly as to the Creeks who intermarried with their former slaves. From the argument of plaintiff's counsel, it is naturally inferable that there were a number of transfers by freedmen, under the act of 1904, who had or might claim to have some Indian blood, these transfers being between the above act and that of 1908 (35 Stat. 312), which made further removal of restrictions. Such conveyances have undoubtedly been enforced and recognized for twenty years or more. The property here involved is now part of the largest city in Oklahoma. Also the Supreme Court of that state has sustained such titles. Rowe v. Sartain, 107 Okl. 199, 230 P. 919; Miller v. Allen, 104 Okl. 38, 229 P. 152; Tiger v. Fewell, 109 Okl. 199, 235 P. 224.

Therefore, the situation is that the act of 1904 is susceptible of two constructions; that one construction will result in sustaining conveyances and titles which have been relied upon for many years; that the other construction will overthrow those titles producing endless confusion, loss and litigation; that either construction will apply only to those conveyances made between April 21, 1904, and May 27, 1908; that the former construction has been announced by the Supreme Court of the state in which the land is situated. In this situation, we think it is wiser to adopt that construction which will sustain the titles.

Therefore, the decree should be and is affirmed.